**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-2546 (RC) |
| | : | | |
| v. | : | Re Document No.: | 10 |
| | : | | |
| $429,900.00 OF BLOCKED FUNDS | : | | |
| ASSOCIATED WITH RYER | : | | |
| INTERNATIONAL TRADING, LTD., *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT**

**I. INTRODUCTION**

This action arises out of an investigation by the Federal Bureau of Investigation. Plaintiff United States of America ("the Government") seeks the forfeiture of $429,900 associated with Ryer International Trading, Ltd. ("Ryer") ("Defendant Funds 1"), $501,771 associated with a U.S. Customs and Immigration Service EB-5 Immigrant Investment Program account held in the name of Tang Xin ("Tang") ("Defendant Funds 2"), and $24,209.85 associated with Tang and Li Xichun ("Li") ("Defendant Funds 3") (collectively, "Defendant Funds"). The Government argues that the Defendant Funds are subject to forfeiture because they (1) constitute (or are derived from) proceeds traceable to violation of, or conspiracy to violate, the International Emergency Economic Powers Act ("IEEPA"), and (2) are property involved in (or traceable to) money laundering offenses. No claimant responded to the Government's complaint, and the Clerk of Court entered default on May 3, 2021. The Government now asks this Court to enter default judgment against the Defendant Funds. For the reasons set forth below, the Court concludes that the government's factual allegations are sufficient to show that the Defendant

Funds constitute or were derived from proceeds of IEEPA violations.  Thus, the Court grants the Government's motion for default judgment.

## II.  FACTUAL BACKGROUND

This case involves two companies that the Government alleges acted as intermediaries in transmitting money from sanctioned North Korean banks to and through the United States financial system in violation of U.S. sanctions.  The Government alleges that this scheme ran afoul of the IEEPA, 50 U.S.C. § 1701, and the federal money laundering statute and its accompanying conspiracy offense, 18 U.S.C. § 1956(a)(2)(A) and § 1956(h).  The Government claims that, as such, the Defendant Funds are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as property which constitutes or is derived from proceeds traceable to a violation of the IEEPA (or conspiracy to violate IEEPA) and 18 U.S.C. § 981(a)(1)(A) as property involved in a violation of the federal money laundering statute (or property traceable to such property).  *See* Compl. ¶¶ 61–62, 64–65.

According to the Government, North Korean financial facilitators, funded by sanctioned North Korean banks—including the Foreign Trade Bank of the Democratic People's Republic of North Korea ("FTB")—wired money to two affiliated front companies, Ryer and Rensy International Trading Co., Ltd. ("Rensy"), which worked in tandem to transmit the funds to and through the United States financial system.  The Government also alleges that the relevant front companies assisted ZTE Corporation ("ZTE"), a China-based telecommunications company, in exporting controlled goods containing U.S.-origin components to North Korea, also in violation of U.S. sanctions.  Compl. ¶¶ 12–19.  Because no claimant to the funds has come forward, the Government asks this court to enter default judgment in its favor.  *See* Pl.'s Mot. Def. J. ("Pl.'s Mot"), ECF No. 10; Mem. Supp. Pl.'s Mot. Def. J. ("Pl.'s Mem."), ECF No. 10-1.

## A.  Statutory and Regulatory Framework

The Government alleges that this scheme ran afoul of the IEEPA and the federal money laundering statute.  The Court finds that the Government has sufficiently pleaded its allegations to connect the Defendant Funds to IEEPA violations.[1]  The Court summarizes the IEEPA below and then describes the alleged scheme in more detail.

The IEEPA authorizes the President to "deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" originating outside the United States.  50 U.S.C. § 1701(a).  This authority includes the ability to investigate "transactions in [the] foreign exchange" or "the importing or exporting of currency."  *Id.* § 1702(a)(1)(A).

Section 206 of the IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the IEEPA.  50 U.S.C. § 1705(a).  Property "which constitutes or is derived from proceeds traceable to" an IEEPA violation is subject to forfeiture.  18 U.S.C. § 981(a)(1)(C).  "This chain of interlocking statutes can thus be summarized as follows: property that 'constitutes or is derived from proceeds traceable to' violations of executive orders and [regulations] promulgated pursuant to the IEEPA is subject to forfeiture."  *In re 650 Fifth Avenue & Related Props.*, 830 F.3d 66, 87 (2d Cir. 2016) (citing 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D); 50 U.S.C. § 1705).

Exercising his IEEPA authority, President Clinton issued Executive Order 12,938, which designates "Weapons of Mass Destruction" ("WMDs") as an "unusual and extraordinary threat"

---

[1] The Court, after finding for the Government on the IEEPA claim, does not go into the money laundering issue because this alternative legal theory provides no additional remedy.  For the same reason, the Court does not address the Government's conspiracy claims.

under the IEEPA.  Exec. Order No. 12,938, 59 Fed. Reg. 58,099 (Nov. 14, 1994).  A decade

later, President George W. Bush issued Executive Order 13,382 denying access to the United

States banking system to anyone designated as a proliferator of WMDs.  Exec. Order No. 13,382,

70 Fed. Reg. 38,567 (June 28, 2005).  The "WMD Proliferators Sanctions Regulations," which

implement Executive Order 13,382, "block" any property interests, including money and other

financial instruments, belonging to or used in support of individuals and entities designated as

WMD proliferators.  31 C.F.R. §§ 544.201, 544.308.  Those individuals and entities are placed

on the "Specially Designated Nationals and Blocked Persons" list (the "SDN" list) administered

by the Department of Treasury's Office of Foreign Assets Control ("OFAC").  *See*

*id.* § 544.201(a).  Department of Treasury regulations bar the "provision of funds, goods, or

services by, to, or for the benefit of any person" designated as an SDN, unless OFAC licenses the

transactions.  *Id.* § 544.201(b); *see also id.* §§ 544.202(c), 544.301, 544.405.

On March 16, 2016, President Obama signed Executive Order 13,722, which, among

other things, prohibits the exportation of goods, services, and technology to North Korea unless

done with the appropriate licensing from OFAC.  Exec. Order No. 13,722, 81 Fed. Reg. 14,943

(Mar. 15, 2016); *see* 31 C.F.R. § 510.206 (2018); *id.* § 510.202(c) ("[A] license or other

authorization issued by OFAC before, during, or after a transfer shall validate such transfer or

make it enforceable to the same extent that it would be valid or enforceable . . . ."); *see also* Pl.'s

Mem. at 15.  In 2017, President Trump signed Executive Order 13,810, blocking "all funds that

are in the United States . . . that originate from, are destined for, or pass through a foreign bank

account that has been determined by the Secretary of the Treasury . . . to have been used to

transfer funds in which any North Korean person has an interest."  Exec. Order No. 13,810, 82

Fed. Reg. 44,705 (Sep. 20, 2017).  The successive Presidents of the United States have renewed

the national emergency underlying these sanctions annually, most recently in June of 2021.  *See,*
*e.g.,* Notice, 86 Fed. Reg. 33,075 (June 21, 2021).

A violation of any of the above orders and regulations would constitute a violation of the
IEEPA under 50 U.S.C. § 1705(a), and, accordingly, any property or funds involved in or
derived from unlicensed transactions in the United States with SDNs would be subject to
forfeiture under 18 U.S.C. § 981(a)(1)(C).

### B.  Relevant Facts and Procedural History[2]

In March 2017, ZTE agreed to plead guilty for conspiring to violate the IEEPA.  Compl.
¶ 12.  Documents from ZTE's legal proceedings "substantiate" that ZTE exported controlled
items to North Korea in exchange for payment in U.S. dollars made by various shell
corporations.  *Id.* ¶ 13.  Two of these shell companies included Ryer and Rensy.  *Id.* ¶ 18.

Ryer is registered in Hong Kong with its primary place of business in Shanghai, and
Rensy was incorporated in Shenzhen and headquartered in Shanghai.  *Id.* ¶¶ 11, 20, 27.  The
Government alleges that both companies were used by sanctioned North Korean banks and
financial facilitators to transmit funds through the United States financial system in violation of
U.S. sanctions and without proper licensing from the OFAC.  *Id.* ¶¶ 4, 24, 34, 36–46.  The
Government also alleges that the companies assisted ZTE in effecting trade with North Korea in
violation of U.S. sanctions.  *Id.* ¶¶ 17–18.  Most of ZTE's contracts with North Korea serviced
the Korea Posts and Telecommunications Company ("KPTC"), a state-owned
telecommunications company in North Korea.  *Id.* ¶ 16.

The Government alleges that Tang and Li, a married couple, helped carry out the Ryer
and Rensy scheme.  Tang served as Ryer's legal representative and Li "described his duties [at

---

[2] The facts described here are drawn from the Government's allegations in its complaint.

Ryer] as 'being in charge of the company's overall operation and management.'" *Id.* ¶¶ 20–21. Li was previously the North Korean Account Manager for ZTE and worked out of ZTE's North Korean office.  *Id.* ¶¶ 22–23.  Ryer was the sole source of income for both individuals after they began work with the company in 2009.  *Id.* ¶ 51.

According to the Government, designated North Korean financial facilitators, paid by sanctioned North Korean banks, would funnel money to Ryer, which would then transit the money through the United States and deliver payment in U.S. dollars.  *Id.* ¶¶ 24, 34.  In particular, Li made at least two requests that the FTB transfer U.S. dollars to a designated entity, each request made on Rensy letterhead.  *Id.* ¶¶ 40, 47–48.  The Government alleges that Ryer received approximately $12,412,223.08 from various documented North Korean financial facilitators, including Dandong Zhicheng Metallic Materials Co., Ltd., the Dandong Hongxiang Industrial Development Co., Ltd. network, Mingzheng International Trading Limited, and Mansundae Overseas Projects.  *Id.* ¶¶ 36–46.

Specifically, between November 2010 and July 2015, the Government alleges that Ryer, on behalf of the KPTC, wired a total of $7,759,888.12 to ZTE without OFAC licensing.  *Id.* ¶ 24. The Government alleges that the funds in question came from North Korean financial facilitators, who were paid by sanctioned North Korean banks.  *Id.*  Li served as the responsible signatory on contracts between Ryer and ZTE.  *Id.* ¶ 25.

Rensy, the Government alleges, worked in tandem with Ryer to carry out its illicit activities.  *See id.* ¶ 32.  Between April 2015 and May 2016, Ryer laundered approximately $6,921,065.88 in U.S. dollars to Rensy, which was transmitted through the United States financial system without proper OFAC licensing.  *Id.* ¶ 34.  North Korean financial facilitators, paid by sanctioned North Korean banks, funded Ryer to make its payments to Rensy.  *Id.*

Around May 3, 2016, a $429,900 payment from Ryer to Rensy was blocked by a U.S. bank due to the funds' connection to North Korean sanctions violations. *Id.* ¶ 35. The Government seeks forfeiture of this payment (Defendant Funds 1).

The Government also seeks forfeiture of $501,771 ($500,000 plus interest) in funds associated with an EB-5 investment visa account opened by Tang and Li in Tang's name (Defendant Funds 2). *Id.* ¶ 49; *see also* Pl.'s Mem. at 1 (providing only instance of precise $501,771 amount). Because Ryer was Tang and Li's sole source of income at the time they submitted the funds, the Government alleges that proceeds from Ryer were used to fund this investment account. *Id.* ¶ 51; *id.* at 10 ("Tang Xin Used Proceeds from Ryer to Fund EB-5 Investment").

Lastly, the Government seeks forfeiture of funds in "personal checking and savings accounts with U.S. banks" and "a U.S. bank account on behalf of Ryer Investment LLC" opened by Tang in 2013. *Id.* ¶¶ 52–53. The bank accounts in question received $2,414,600 from Ryer's overseas accounts, which the Government alleges were funded by North Korean financial facilitators. *Id.* ¶ 54. The Government seeks forfeiture of the remaining balance of $24,209.85 from the accounts (Defendant Funds 3). *Id.* ¶¶ 54–55.

The Government filed a complaint for forfeiture *in rem* on September 11, 2020, seeking forfeiture of the Defendant Funds. Compl. On September 14, 2020, the Clerk of Court entered a Warrant for Arrest *in Rem*. Warrant for Arrest, ECF No. 4. The Government then, after identifying all known potential claimants, published a public notice of forfeiture and sent direct notices to all potential claimants, including Tang and Li. *See* Decl. Publication, ECF No. 6; Decl. Supp. Default ¶ 6, ECF No. 7. The deadline to file a claim after the Government submitted its notice passed and no party filed a claim. *See* Decl. Supp. Default ¶ 7. On May 3, 2021, the

Clerk of the Court entered default as to the Defendant Funds.  *See* Clerk's Entry of Default, ECF No. 9.  The Government moved for entry of default judgment on May 28, 2021.  Pl.'s Mot.  That motion is now before the Court.

### III.  LEGAL STANDARD

Default judgment requires a two-step process.  Fed. R. Civ. P. 55; *see also Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017).  First, a party must "request[] that the Clerk of the Court enter default against a party who has 'failed to plead or otherwise defend'" the action.  *Bricklayers*, 273 F. Supp. 3d at 179 (quoting Fed. R. Civ. P. 55(a)).  The entry of default "establishes the defendant's liability for the well-pleaded allegations of the complaint."  *United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 4 (D.D.C. 2020).  Second, "the party must move for entry of default judgment and, upon the party's request, allow the court 'to enter or effectuate judgment.'"  *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte. Ltd.*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting Fed. R. Civ. P. 55(b)).

Default judgment is typically available "only when the adversary process has been halted because of an essentially unresponsive party.  In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights."  *Id.* (quoting *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).  But a defendant's failure to respond or appear "do[es] not automatically entitle plaintiff to a default judgment."  *Id.* (alteration in original) (quoting *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26 (D.D.C. 2008)).  Rather, the complaint must state a claim for relief in order for the plaintiff to be entitled to default judgment.  *Id.*  Stated differently, "[d]efault establishes the defaulting party's liability for the well-pleaded allegations of the complaint," but not for allegations that are insufficiently

pleaded. *Id.* (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011)).

## IV. ANALYSIS

The Government asks the Court to authorize forfeiture of the three Defendant Funds. The Government's claim must meet both the legal standard for default judgment and for civil forfeiture under the Federal Rules of Civil Procedure. Specifically, Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions governs *in rem* civil forfeiture actions. *See* Fed. R. Civ. P. Supp. R. G. The rule contains both notice requirements and substantive pleading requirements.[3] *See Velmur*, 368 F. Supp. 3d at 17; Fed. R. Civ. P. Supp. R. G(2), (4). The Government has met those requirements here.

### A. Notice

Under Supplemental Rule G's notice requirements, the government must (1) publish public notice of a forfeiture and (2) provide direct notice to potential claimants of the property to be forfeited. Fed. R. Civ. P. Supp. R. G(4)(a), (b). The government must select one of three options for public notice, one of which is publication on an official government forfeiture website for at least thirty consecutive days. Fed. R. Civ. P. Supp. R. G(4)(a)(iii)–(iv). The publication should "describe the property with reasonable particularity," "state the times . . . to

---

[3] Supplemental Rule G also requires that if—as is the case here—the subject of the seizure is not real property, the "clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control." Fed. R. Civ. P. Supp. R. G(3)(b)(i). All Defendant Funds are currently in the government's control. *See* Compl. at 1 ("$429,900.00 . . . which are currently held in a blocked funds account at Bank 1 . . . $501,771.00 . . . which funds the government previously seized . . . and $24,209.85 . . . which funds the government previously seized."). The Clerk of Court issued a warrant for the funds' arrest three days after the government filed its complaint. *See* Warrant for Arrest *in Rem*. Thus, this requirement Supplemental Rule G is met.

file a claim and to answer," and "name the government attorney to be served with the claim and answer."  Fed. R. Civ. P. Supp. R. G(4)(a)(ii).

Here, the Government has complied with Supplemental Rule G's public notice requirement.  The Government published a notice on its official forfeiture website, http://www.forfeiture.gov, for thirty consecutive days from February 3, 2021, to March 5, 2021.  Pl.'s Mem. at 9; Decl. of Publication at 4.  The online notice described the seized funds and the parties with whom the funds were associated; provided a date by which parties were required to file a claim, sixty days from date of publication; and identified the appropriate government attorney to whom the parties should serve a claim and an answer, Michael Grady.  Decl. of Publication at 2–3.  As such, the Government has met Supplemental Rule G's public notice requirement.

In addition to public notice, the government is required to directly "send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant."  Fed. R. Civ. P. Supp. R. G(4)(b)(i).  The notice "must be sent by means reasonably calculated to reach the potential claimant."  Fed. R. Civ. P. Supp. R. G(4)(b)(iii)(A).  But the rule requires only "that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice."  *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 47 (D.D.C. 2018) (quoting *Mesa Valderrama v. United States*, 417 F.3d 1189, 1197 (11th Cir. 2005)).  The direct notice must include the date on which the notice is sent and the deadline for filing a claim (at least 35 days after the notice is sent), must state that an answer or a Rule 12 motion must be filed no later than twenty-one days after filing the claim, and must name the

government attorney to be served with the claim and answer.  Fed. R. Civ. P. Supp. R. G(4)(b)(ii).

The Government has also complied with Supplemental Rule G's direct notice requirement.[4]  The Government identified all known claimants and emailed notice to claimants on February 3, 2021, Decl. Supp. Default ¶ 6, which included Tang and Li.[5]  Pl.'s Mem. at 9. While the Government has not shown that Tang and Li received notice, email is sufficient for notifying international defendants whose location cannot be easily identified.  *See Twenty-Four Cryptocurrency Accts*, 473 F. Supp. 3d at 6 (holding that email is appropriate notice when "the case involves international defendants whose locations are hard to pin down and the nature of the crime necessarily entails some degree of cyber-proficiency on the part of the Defendant Properties' owners"); *United States v. 155 Virtual Currency Assets*, No. 20-cv-2228, 2021 WL 1340971, at *5 (D.D.C. 2021) (finding email notification sufficient under Supplemental Rule G). As such, the Government has met Supplemental Rule G's direct notice requirement.

---

[4] Supplemental Rule G states that a direct notice must contain (1) the date on which the notice is sent, (2) the deadline for filing a claim, at least thirty-five days after the notice is sent, (3) a statement that an answer or Rule 12 motion must be filed within twenty-one days of filing a claim, and (4) the name of the government attorney to be served with the claim and answer.  Fed. R. Civ. P. Supp. R. G(4)(b)(ii).  The Government does not allege particular facts demonstrating that it has met these requirements.  The Government merely states that it "identified all known potential claimants" and sent notice to them via email, Decl. Supp. Default ¶ 6, and "gave notice of this action to all known potential claimants pursuant to the procedures set forth in Rule G(4) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions," *id.* ¶ 5.  Nevertheless, the Court accepts these assertions as sufficient.

[5] In its motion for default judgment, the Government asserts that it sent direct notice by email to Tang and Li specifically.  Pl's Mem. at 5.  But the Government did not assert that it sent notice directly to Tang and Li in its declaration in support of default judgment, instead broadly stating that it gave notice to "all known potential claimants" without naming Tang and Li.  Decl. Supp. Default ¶ 5.  The Court will accept the Government's claim in its default judgment motion that the email was sent directly to Tang and Li.

### B. Adequacy of the Complaint

Alongside its notice requirements, Supplemental Rule G "sets the specifications of a complaint in an *in rem* forfeiture action." *Mingzheng*, 324 F. Supp. 3d at 45. The complaint must (1) "be verified"; (2) state the grounds for jurisdiction and venue; (3) "describe the property with reasonable particularity"; (4) "identify the statute under which the forfeiture action is brought"; and (5) "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2). Courts consider these requirements to establish a "higher standard of pleading" than that imposed by Federal Rule of Civil Procedure 8. *United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008). Nevertheless, Rule 8 "may help to clarify when a civil forfeiture complaint" states a claim. *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249 (S.D.N.Y. 2010).

The first four requirements for forfeiture are largely formal, and the Government meets them here. The complaint is verified. *See* Compl. at 13. It identifies the basis for jurisdiction and venue. *See id.* ¶¶ 7–11. It describes the properties at issue by identifying specific amounts transferred, relevant dates, and entities involved in the transactions, as well as providing details about the relevant transactions. *See id.* ¶¶ 34–35, 49–55. Lastly, it identifies the provisions under which the Government seeks forfeiture. *See id.* ¶¶ 4–6.

The fifth requirement is more substantive; it requires the Government to establish the legal basis for its claims. *See Mingzheng*, 324 F. Supp. 3d at 51. Here, the Government claims as its legal bases 18 U.S.C. § 981(a)(1)(C), which subjects to forfeiture property that constitutes or is derived from proceeds traceable to violations of, among other things, the IEEPA (or conspiracies to commit such violations), and 18 U.S.C. § 981(a)(1)(A), which subjects to

forfeiture property involved in money laundering offenses (or property traceable to such property).  *See* Compl. ¶¶ 62, 66.  The Government must allege "sufficient facts to support a reasonable belief that [it] would be able to show at trial by a preponderance of the evidence that" the Defendant Funds constituted or were derived from proceeds traceable to an IEEPA violation or were involved in money laundering violations and are thus subject to forfeiture.  *See Mingzheng*, 324 F. Supp. 3d at 51.  Allegations that do not meet the standard, for example, are those that "merely describe[] the property, and, parroting the language of the statute, state[] that [the property is] forfeitable as proceeds of a[n unlawful] transaction."  *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 638–39 (1st Cir. 1988).[6]  This standard is "not particularly onerous," *Mingzheng*, 324 F. Supp. 3d at 51, and the Government's factual allegations satisfied this standard.

### 1.  IEEPA Violation

As previously detailed, property constituting or derived from proceeds traceable to a violation of the IEEPA, including violation of any order or regulation issued under the IEEPA or conspiracy to commit such an offense, is subject to forfeiture.  *See* 18 U.S.C. § 981(a)(1)(C); *id.* § 1956(c)(7)(D); 50 U.S.C. § 1705(a).  The Government must state "sufficiently detailed facts" to support a reasonable belief that it will meet its burden of proof at trial to show that the Defendant Funds constitute or are derived from proceeds traceable to an IEEPA violation to be subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

---

[6] *Hopkinton* concerned Supplemental Rule E(2)(a) instead of Supplemental Rule G(2)(f), "but the advisory committee's note indicates that the [G(2)(f)] language is designed to codify the 'standard' that 'has evolved' from case law interpreting its predecessor—Supplemental Rule E(2)(a)—and 'carr[y] this forfeiture case law forward without change.'"  *United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015).

The relevant part of the IEEPA regulations entail that any entity that transacts with or on behalf of North Korean SDNs through the United States financial system must first obtain a license from OFAC.  *See* 31 C.F.R. § 544.201(a); Exec. Order No. 13382; *United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Co.*, Nos. 17-mj-217, et al., 2017 WL 3233062, at \*1, 5 (D.D.C. May 22, 2017) (explaining that foreign entities that are acting on behalf of North Korean SDNs have committed violations of IEEPA and the anti-money laundering statute by conducting unauthorized United States dollar wire transfers).  The Government alleges a pattern of North Korean financial institutions and their affiliates using front companies to subvert United States trade sanctions, access the United States financial system, and obtain U.S.-origin products without a license.  *See* Compl. ¶¶ 1–3, 14.  In a related case, ZTE entered a guilty plea for conspiring to violate the IEEPA, and the proceedings revealed that Ryer and Rensy facilitated its violations, *see id*. ¶¶ 12–18.

Defendant Funds 1 is a $429,000 payment from Ryer to Rensy that was blocked by a U.S. bank due to a connection with sanctions.  Compl. ¶ 35.  The government believes that Defendant Funds 1 constitute IEEPA violations because the transaction was funded by SDNs, transacted on behalf of SDNs, routed through United States banks, and attempted without obtaining OFAC licenses.  The Government identifies Defendant Funds 1 as following a series of 23 previous illicit payments totaling $6,921,065.88.  *Id*. ¶ 34.  To support the claim that these payments were funded by North Korean financial facilitators, the government outlines in detail that Ryer received approximately $12,412,223 from designated front companies Dandong Zhicheng, Dandong Hongxiang, Mingzheng, and Mansundae.  *Id*. ¶ 36–46.  Further supporting that Ryer and Rensy acted on behalf of sanctioned North Korean entities, the government points to the related case in which Chinese company ZTE ceded that Ryer and Rensy facilitated its

violations, *id.* ¶ 12–18, specifically by wiring $7,759,888.12 to ZTE on behalf of the KPTC to fund ZTE's exports, *id.* ¶ 24.  Importantly, Ryer and Rensy failed to seek OFAC licensing for their transactions in the United States.  *Id.* ¶ 34.

Defendant Funds 2 is a $501,771 sum associated with an EB-5 investment visa account opened by Tang and Li in 2012.  Compl. ¶ 49.  The Government alleges that Tang and Li's EB-5 records indicate that their employment with Ryer constituted their sole source of income since 2009.  *Id.* ¶ 51.  Thus, the Government infers that the couple's income, used to fund the EB-5 account, was in turn funded by Ryer.  Given that various designated entities funded Ryer, *see id.* ¶¶ 36–46, this implies that Defendant Funds 2 is traceable to proceeds of IEEPA violations.

Defendant Funds 3 is the remaining balance of $24,209.85 in three bank accounts that Tang and Li opened in United States banks.  Pl.'s Mem. at 5.  The Government links Tang and Li (and their activities with Ryer and Rensy) to the FTB, ZTE, and other designated entities.  For example, the allegations include payments from Ryer to ZTE on behalf of the KPTC.  Compl. ¶ 24.  Documents from ZTE's legal proceedings allegedly show that when Ryer made those payments, Li represented the company on contracts with ZTE.  Compl. ¶ 25.  Altogether, the Government argues that Tang and Li are the perpetrators behind the actions of Ryer and Rensy to support the North Korean government and its financial institutions.  *Id.* ¶ 59.  The Government alleges that after Tang and Li opened the three United States bank accounts in 2012, Ryer wired approximately $2,414,600 into these accounts.  *Id.* ¶ 54.  Again, the Government points out that Ryer is funded by sanctioned North Korean banks.  *Id.* ¶¶ 38, 42, 44, 46.  The remaining balance of the three accounts comprise Defendant Funds 3, and thus the allegations suggest that Defendant Funds 3 constitute an IEEPA violation.

The Court finds that the allegations support a reasonable belief that the Government could meet its burden at trial and show that each of the Defendant Funds are subject to forfeiture as funds that constitute or are derived from IEEPA violations.  Fed. R. Civ. P. Supp. R. G(2); 18 U.S.C. § 981(a)(1)(C).  The allegations go beyond merely describing the property and parroting the language of the statute.  *See Hopkinton*, 852 F.2d at 638–39.  The Complaint alleges the details of specific transactions involving entities already designated by OFAC.  *See Mingzheng*, 324 F. Supp. 3d at 51 (finding that the Government met the pleading standard by alleging that the FTB was a designated entity and that the defendant funds were transacted on the FTB's behalf).  The Government also describes tangible records—such as transaction requests that Li sent to the FTB on Rensy letterhead and documents from ZTE's legal proceedings.  Compl. ¶¶ 47–48, 13.  Notably, in addition to alleging upwards of eighty-five illicit transactions, the Government alleges that the actors never sought OFAC licensing.

By identifying unauthorized transactions with SDNs and documents that could support their illicit nature, the Government has provided a sufficient level of detail.  *See Velmur*, 368 F. Supp. 3d at 20 (finding that the Government met the pleading standard when the Government specified transactions and alluded to confidential sources who could attest to the illicit nature of these transactions).  Given that any transaction conducted with or on behalf of North Korean SDNs through the United States financial system requires an OFAC license (and is otherwise an IEEPA violation), and given that the standard of pleading is "not particularly onerous," the Government has surpassed its burden under Supplemental Rule G(2).

Because the Government has sufficiently pleaded that each of the Defendant Funds constitute or are traceable to an IEEPA violation, the Court will not consider the money laundering and conspiracy allegations, which only serve as alternative theories for relief.  The

16

Court holds that the Government has met its burden under Supplemental Rule G(2) for forfeiture of the Defendant Funds under 18 U.S.C. § 981(a)(1)(C) and, accordingly, the Court grants the Government's default judgment motion for forfeiture of Defendant Funds on the grounds of its well-pleaded allegations.

## V.  CONCLUSION

For the foregoing reasons, this Court **GRANTS** the Government's motion for default judgment (ECF No. 10).  Judgment is entered in favor of the United States and against the potential claimants of the Defendant Funds, and the Defendant Funds are forfeited.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  November 1, 2021                                       RUDOLPH CONTRERAS
                                                                          United States District Judge